UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

|  |  |  |
|---|---|---|
| In re: | ) ) ) | |
| | ) | Chapter 11 |
| Star Transportation PA Inc., *et al.*[1] | ) ) | |
| | ) | Case No. 24-21557-CLC |
| | ) | |
| Debtors. | ) ) | (Joint Administration Pending) |

## DECLARATION OF VICTOR KHRAMOV IN SUPPORT OF THE CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Victor Khramov, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief, including the information included in the exhibit attached hereto:

### Background

1. My name is Victor Khramov, I am over the age of eighteen, and I am competent to testify.

2. I am the president of the above-captioned debtors and debtors in possession (collectively, the "Debtors," and each, a "Debtor") and own 100% of the equity ownership (as applicable, membership interests or stock) of each of the Debtors. I have served in that capacity since the formation of each of the Debtors, and I have worked actively with the Debtors' other members of management and proposed professionals to prepare for the commencement of the Debtors' chapter 11 cases (the "Chapter 11 Cases").

---

[1] The Debtors and last four digits of their tax identification numbers are: (i) Star Transportation PA Inc (0722); (ii) Star Truck Service, Inc. (0619); (iii) Star Transportation A, Inc. (9389); (iv) Finance Solutions LLC (7287); (v) MDL Business Group LLC (6201); and (vi) US Express Line LLC (7690). The mailing address of the Debtors is 301 NW 171st Street, Unit B, Miami Gardens, Florida 33169.

3. The Debtors constitute a business enterprise that collectively provide over the road trucking transportation and distribution services across the 48 contiguous United States. The Debtors maintain a fleet of 219 trucks and 235 trailers, comprised of both leased and owned equipment.

4. I am familiar with the Debtors' day-to-day operations, business, financial affairs, and books and records as they exist, as well as the circumstances leading to the commencement of the Chapter 11 Cases. I submit this declaration (this "Declaration") to assist the Court and other parties in interest in understanding the circumstances and events that led to the commencement of the Chapter 11 Cases and in support of the "first-day" motions and applications that the Debtors are concurrently filing with the Court herewith (the "First Day Pleadings"). I am authorized to submit this Declaration on behalf of the Debtors.

5. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents as they exist, information provided to me by employees, contractors, and/or management of the Debtors, my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial condition, or from my discussions with the Debtors' proposed restructuring counsel, Pack Law. If called upon to testify, I would and could testify competently to the facts set forth in this Declaration on the basis of the information that I have gleaned from the sources listed above.

6. I am advised by counsel that this Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334, and that venue is proper in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") pursuant to 28 U.S.C. §§ 1408 and 1409.

**The Debtors' Prepetition Business, Corporate Structure, and Capital Structure**[2]

I.     **Corporate Structure and History.**

7.     Prior to the formation of the Debtors, I drove trucks, gaining three and one half (3.5) years of actual experience behind the wheel and logging over 400,000 miles across all 48 contiguous United States—enough to drive coast-to-coast some 160 times—delivering and picking up loads nationwide.  I knew the business well then and I understand it deeply now.

8.     In 2016, after working as CEO for another carrier, I founded Star Transportation PA Inc, and the "Star Transportation" brand was born.  In the first six (6) months after founding the company, I continued to personally drive to help the company cover expenses, establish operations, and grow.  I have held my Commercial Driver's License ("CDL") for more than eleven (11) years, and this actual, behind-the-wheel experience has been a major factor in Star Transportation's success.  It has given me a unique perspective to truly understand and empathize with each of our team members, from drivers to safety managers to mechanics.  It has also afforded me the opportunity to better comprehend the needs and expectations of brokers, shippers, and receivers.  I have been actively involved in the shipping and transportation industry for over a decade and am proud of what Star Transportation has grown to become.

9.     As indicated above, through much hard work from the entire Star Transportation team, through difficult times, and with the aid of unprecedented industry knowledge, the Debtors have grown since 2016, from a fleet of zero to a fleet of 219 trucks and 235 trailers, and from one company to six.  Each Debtor and its respective role in the business are set forth in the paragraphs that follow.

---

[2] Capitalized terms not otherwise defined in the Introduction have the meanings ascribed to such terms elsewhere herein or in the First Day Pleadings, as applicable.

a. ***Star Transportation PA Inc.***  Debtor Star Transportation PA Inc ("Star") was incorporated in Pennsylvania on or around December 5, 2016, domesticated in Indiana on January 27, 2024, and presently maintains its principal place of business at the Debtors' nerve center at its offices in Miami Gardens, Florida.  It also maintains offices or office spaces in Indianapolis, Indiana and Newton, Pennsylvania.  Star serves as the Debtors' primary transportation and logistics provider.  Star's primary assets are trucks and trailers (both leased and owned), which form the core of the Debtors' operational fleet.  Star houses the vast majority of the Debtors' workforce, including approximately 280-330 driver independent contractors on a weekly basis, twenty-five (25) to thirty (30) independent contractor dispatchers on a weekly basis, twenty-three (23) independent contractor office workers, and various other workers key to the Debtors' operations.  Star's business operations are essential for maintaining the flow of goods and supporting the supply chain across the United States.

b. ***Star Truck Service Inc.***  Debtor Star Truck Service Inc. ("Star Truck") was incorporated in Florida on or around June 13, 2017, and maintains its principal office in Star's Miami Gardens offices.  Star Truck also maintains offices and facilities separate form those of Star in Indianapolis, Indiana.  Star Truck provides equipment, parts, and tools essential for the trucking and fleet services industry to the Debtors' operations.  Star Truck is responsible for maintaining and repairing the Debtors' fleet, ensuring all vehicles comply with Department of Transportation ("DOT") standards and are kept in safe operating condition.  Star Truck's assets include a comprehensive range of equipment, parts, and tools, with its trucks leased to Star.  The Debtors' ten (10) employee mechanics work for Star Truck, and these mechanics (and Star Truck in general) play a critical role in ensuring the fleet remains safe and roadworthy, contributing not only to the Debtors' operations, but also to the safety of our drivers and all road users.

c. ***Star Transportation A Inc.***  Debtor Star Transportation A Inc ("Star A") was incorporated in Florida on or around October 11, 2017.  Star A itself does not hold any assets or workforce, as it was initially established to develop the operational structure and expand a network of branches across the United States.  However, the company faced challenges in executing its projected tasks due to the current market conditions in the transportation industry and the impact of the ongoing worldwide trade disruption, which significantly altered its original plans.  Despite these setbacks, Star A remains an integrated component of the Debtors' operations, both as guarantor of key debt and as overseer and coordinator among the various Debtor entities.

d. ***Finance Solutions LLC.***  Debtor Finance Solutions LLC ("Star Finance") was organized in Delaware on or around September 8, 2021, and is primarily responsible for the upgrading of Star's fleet of trucks and trailers.  While Star Finance's operations remain limited at the present date, given the market difficulties that have plagued the Debtors since its formation, I believe Star Finance will have an important role to play in the Debtors' future.  Star Finance also guarantees certain key debts of the Debtors.

e. **MDL Business Group LLC.** Debtor MDL Business Group LLC ("MDL") was organized in Florida on or around April 14, 2015. While initially established as a trucking company, MDL has since shifted its focus and now primarily provides concierge services to Star. These services include taxi arrangements, flight bookings, hotel reservations, hiring support, and clerical work. Over time, MDL's role has evolved in parallel with the Debtors' business to meet the operational needs of Star, offering tailored services to facilitate smoother business operations. MDL also guarantees certain key debts of the Debtors.

f. **US Express Line LLC.** Debtor US Express Line LLC ("US Express") was organized in Missouri on or around July 21, 2015. US Express was purchased was purchased in 2017 with the intent of supporting additional business growth. Historically, when Star faced challenges with fleet expansion, US Express was specifically tasked with working with owner-operators who already owned trucks. US Express' primary function was to provide dispatch services, including booking loads and managing billing transactions for these owner-operators. However, COVID-19 and its impact on national and international transportation has (to date) disrupted future plans, limiting US Express' growth. While US Express largely ceased operations in 2018 and has virtually no assets, it also guarantees certain key debts of the Debtors.

II. **The Debtors' Business, Operations, and Key Vendors and Expenses.**

10. The Debtors' 2024 revenue to date is approximately $60 million.

11. As described above, the Debtors are engaged in transportation and trucking services, as well as other business lines related thereto, including truck and trailer maintenance. The Debtors, collectively employ approximately eleven (11) W-2 employees and seventy (70) non-driver independent contractors. In the ordinary course of business, the Debtors utilize the services of driver independent contractors and maintain approximately 280-330 drivers on the road per week.

12. The Debtors predominantly acquire shipping customers through the use of brokers. These brokers typically represent a wide range of clients, each with diverse and varying shipping needs. When the Debtors accept a work order from a broker, they coordinate the transportation by visiting the ultimate client's location, loading trucks, and shipping the product in accordance with the specific instructions and directions provided by such client. Payments to the Debtors are

facilitated through the brokers, with standard payment terms ranging from thirty (30) to ninety (90) days.

13.     **RTS:**  Historically, in large part due to the standard payment terms in the industry, the Debtors have been unable to operate without factoring their invoices.  The lifeblood of the Debtors' operations lies in the factoring of their receivables through companies like RTS Financial Services ("RTS").  RTS purchases the invoices and provides immediate funding to the Debtors, typically advancing the full face amount of any given invoice, less a nominal factoring fee of approximately 0.8% to 1.5%.  RTS also manages the billing and collection efforts related to these invoices.  Typically, the Debtors factor approximately $6,000,000.00 worth of receivables through RTS, which amount accounts for typical 90-day terms, for which collection typically takes place on a 45-day basis.  As set forth below, the Debtors view RTS as a vital business partner in an industry that is facing unprecedented hardship.  Accordingly, the Debtors have made arrangements to continue their factoring relationship with RTS on a post-petition basis through the provision of "debtor-in-possession financing."

14.     **Pilot:**  As a trucking company, fuel is of paramount importance to the Debtors' operations.  The Debtors' primary fuel partner is Pilot Travel Centers LLC ("Pilot") through whom the Debtors engage in fuel purchase transactions empowered by Pilot's proprietary billing system.  The Debtors receive fuel services from Pilot on a weekly basis from Monday to Sunday, being invoiced on the following Monday.  In the ordinary course of business, Pilot drafts amounts owed on a weekly basis within a few business days of the invoice date.  The Debtors' average weekly fuel purchase transactions with Pilot are in the amount of approximately $400,000.

15.     **WEX:**  Additionally, like the Debtor's relationship with Pilot for fuel, the Debtors partner with WEX, Inc. ("WEX") to meet their repair costs—efficiently—in the ordinary course

of business and maintain a line of credit in the amount of $65,000 to fund repairs across the United States.  Generally, WEX drafts payment from Star's account automatically in the ordinary course of business, resulting in the Debtors' payment of approximately $6,000 to $20,000 on a daily basis, depending on the scope of repairs.  This payment typically follows approximately seven (7) days after the actual physical repair is completed on the equipment itself.

### III. Prepetition Capital Structure.

16. The Debtors' capital structure is relatively straightforward and consists of secured debt, unsecured debt, and equity.

### A. The Debtors' Secured Debt and Equipment Leases.

17. The vast majority of the Debtors' secured debt is comprised of its fleet of trucks and trailers.  In addition to the owned trucks subject to a security interest by the secured parties identified below, much of the Debtors' fleet of trucks and trailers are leased equipment.  For the sake of legibility, the Debtors include in the table(s) that follow both owned and leased equipment.[3]

| **Debtor(s)** | **Creditor** | **Collateral/Leased Equipment** | **Amount Owed[4]** | **Approximate Value of Collateral (Approx.)** |
|---|---|---|---|---|
| Star Transportation PA Inc | Bank of America Leasing & Capital LLC | Financed Trucks and/or Trailers | $4,125,586.28 | $2,919,000.00 |
| Star Transportation PA Inc | M&T Capital Leasing Corporation | Financed Trucks and/or Trailers | $2,144,231.89 | $1,685,000.00 |

---

[3] However, for the avoidance of doubt, the Debtors' inclusion of the nominally owned and leased equipment herein is not an admission or concession that any such equipment is in fact subject to a "true lease" rather than a security interest or vice-versa.  The Debtors explicitly reserve all of their rights with respect to their equipment and the Debtors' proposed counsel continue to investigate the extent, priority, and validity of any and all alleged security and/or lessor interests in the Debtors' equipment.

[4] With respect to leased equipment, the amount owed reflects the portion of the lease payments presently due and owing. With respect to financed equipment, the amount owed reflects the estimated total outstanding indebtedness as of the Petition Date, whether presently due and owing or otherwise.

| | | | | |
|---|---|---|---|---|
| Star Transportation PA Inc | M&T Equipment Finance Corporation | Financed Trucks and/or Trailers | $1,141,566.40 | $742,000.00 |
| Star Transportation PA Inc | The Bancorp Bank | Financed Trucks and/or Trailers | $2,490,069.99 | $1,660,000.00 |
| Star Transportation PA Inc | Ascentium Capital LLC | Financed Trucks and/or Trailers | $18,496.55 | $15,000.00 |
| Star Transportation PA Inc | Volvo Financial Services (VFS US LLC) | Financed Trucks and/or Trailers | $7,371,436.22 | $5,344,000.00 |
| Star Truck Service, Inc. | Crossroads Equipment Lease & Finance | Financed Trucks and/or Trailers | $462,456.00 | $375,000.00 |
| Star Truck Service, Inc. | De Lange Landen Financial Services Inc | Financed Trucks and/or Trailers | $147,790.00 | $125,000.00 |
| Star Truck Service, Inc. | TAB Bank | Financed Trucks and/or Trailers | $329,868.00 | $250,000.00 |
| Star Truck Service, Inc. | Wells Fargo Equipment Finance, LLC | Financed Trucks and/or Trailers | $333,134.00 | $270,000.00 |
| Star Truck Service, Inc. | Chrysler Capital | Financed Trucks and/or Trailers | $22,217.30 | $15,000.00 |
| Star Truck Service, Inc. | Toyota Commercial Finance | Financed Trucks and/or Trailers | $44,892.33 | $30,000.00 |
| Star Transportation PA Inc | Transport Enterprise Leasing LLC | Leased Trucks and/or Trailers | $1,139,319.23 | N/A |
| Star Transportation PA Inc | Metro Trailer Leasing | Leased Trucks and/or Trailers | $129,702.29 | N/A |
| Star Transportation PA Inc | Diamond Rental and Leasing | Leased Trucks and/or Trailers | $11,085.20 | N/A |
| Star Truck Service, Inc. | Commercial Equipment Finance International LLC | Leased Trucks and/or Trailers | $46,781.42 | N/A |

8

| Star Transportation PA Inc | Leaf Capital Funding LLC | Electronic Logging Device (ELD) Systems | $45,556.82 | Unknown. |
|---|---|---|---|---|
| Star Transportation PA Inc | TVT Capital Source LLC | All assets of the Debtors. | $789,687.50 | Unknown. |
| Star Transportation PA Inc | TVT Business Funding LLC | All assets of the Debtors. | $789,687.50 | Unknown. |
| Star Transportation PA Inc, US Express Line LLC | RTS Financial Services | All assets of the Debtors. | $5,891,795.28 | Unknown. |

**B. The Debtors' Unsecured Debt.**

    **a. Trade and Operations Creditors.**

18.    The Debtors' remaining creditors are generally unsecured creditors and vendors to whom the Debtors owe money on account of ordinary course transactions therewith. Two of these key creditors, Pilot and WEX, are discussed in Section II *supra*. The Debtors also maintain a series of vital insurance policies, covering everything from general liability, workers' compensation, employers' liability to motor truck cargo, automobile liability, and garage liability, all through their insurance broker, Stagstone Risk Management.

19.    In addition to these trade creditors, the Debtors employ or otherwise contract with over 300 individuals in various roles, including drivers, dispatchers, and office workers (collectively, the "Workforce"). As set forth in the Worker Wages and Salaries Motion (as defined herein), the Debtors' Workforce's stability and cooperation is vital to the Debtors' success. Accordingly, the Debtors are seeking approval to pay all relevant Workforce claims on an emergency basis to protect the Workforce, their families and wellbeing, and the Debtors' overall operational health.

b. **Other Lease Obligations.**

20. In addition to those obligations set forth above, the Debtors have leasehold interests in various offices, office spaces, and facilities as set forth in the table below.

| **Debtor(s)** | **Premises/Office Space Address** | **Landlord** | **Monthly Rent and Unpaid Rent (If Any)** |
|---|---|---|---|
| Star Transportation PA Inc | 301 NW 171st Street, Miami Gardens, Florida 33169 | SAVITS DANIEL PROPERTIES III INC | Monthly: $27,514.87 Unpaid: $82,544.61 |
| Star Transportation PA Inc | 1111 Park Centre Blvd, Miami Gardens, Florida 33169 | 1111 PCB HOLDINGS LLC | Monthly: $16,891.86 Unpaid: $41,983.65 |
| Star Transportation PA Inc | 101 W Ohio Street Suite 2021 Indianapolis, Indiana 46204-0000 | WEST OHIO II LLC DBA AMERIMAR BUSINESS CENTERS | Monthly: $947.69 Unpaid: $947.69 |
| Star Transportation PA Inc | 41 University Drive, Ste 400 Newtown, PA 18940 | REGUS | Monthly: $260.20 Unpaid: $520.40 |
| Star Truck Service Inc | 101 West Ohio Street, Building #2000, Suite 2010, Indianapolis, IN 46204 | WEST OHIO II LLC DBA AMERIMAR BUSINESS CENTERS | Monthly: $580.22 Unpaid: $580.22 |
| Finance Solutions LLC | 200 Continental Dr., Newark, DE 19713 | REGUS | Monthly: $188.00 Unpaid: $679.65 |
| US Express Line LLC | 100 Chesterfield Business Pkwy., Chesterfield, MO 63005 | REGUS | Monthly: $78.00 Unpaid: $373.70 |

**C. Equity Interests in the Debtors.**

21. The Debtors' equity consists of those membership interests and stock described in each Debtor's Chapter 11 Petition [Docket No. 1], the Debtors' Corporate Ownership Statement filed contemporaneously herewith, and the Debtors' List of Equity Security Holders filed contemporaneously herewith. I, Victor Khramov, own 100% of the Debtors' equity interests.

**IV.    The Debtors' Assets.**

22.    The Debtors' principal balance sheet assets are their accounts receivable, together with various deposits and prepayments to lessors and taxing authorities. The Debtors' primary operational assets are the trucks and trailers that comprise their fleet, as described in greater detail in the sections above.

23.    I am also currently reviewing, among other things, the Debtors' books and records as they exist, certain documents, and various other information in coordination with the Debtors' proposed professionals to ascertain whether the Debtors have any claims or causes of action against third parties that the Debtors intend to pursue in the exercise of their reasonable business judgment, as informed by the advice of such proposed professionals. I anticipate that my review will continue after the filing of these Chapter 11 Cases to ensure that potential assets of the Debtors' estates are preserved and maximized for stakeholders.

**V.    Key Events Leading to the Chapter 11 Cases and Next Steps.**

24.    The trucking industry has been in a state of distress for several years, but the situation in 2024 has reached unprecedented levels, with a cascade of negative trends creating a perfect storm of financial distress and widespread collapse. Rising fuel costs, increased insurance claims, and a persistent shortage of drivers have been key factors contributing to the industry's downturn.

25.    Adding to this, as well known, the U.S. economy post-pandemic has been experiencing some of the highest inflation in the past 40 years, which has severely impacted all aspects of trucking operations. The cost of maintaining and repairing trucks and trailers has skyrocketed, with some repair costs tripling. Parts that were once readily available are now scarce, leading to significant delays and inflated prices. For many operators, the combination of rising costs and supply chain disruptions has made it nearly impossible to keep their fleets operational

without running into significant losses.  Inflation has also affected other critical areas such as tires, brakes, and routine maintenance, with pricing increases that far outstrip the revenue carriers are able to generate, further compounding the financial strain.  The paragraphs that follow highlight some of these key operational disruptions and how they have affected the Debtors, as well as the Debtors' general path forward to maximize the value of their estates for the benefit of all of their stakeholders.

### A. Difficulties in the Trucking Industry.

26.     The pandemic plagued the trucking industry with a litany of substantial (though likely temporary) difficulties.  With the disruptions in trade and logistics, demand greatly weakened and trucking companies like the Debtors have found themselves with a dangerous combination of too little cargo, too many trucks, and too few drivers.  The industry has seen a great reduction in overall fleet utilization, resulting in many trucks being forced to remain idle for extended periods, unable to secure enough loads to cover their operating costs.  This underutilization chokes revenue streams and has led to situations in which even the trucks that are on the road often operate at a loss, as fixed costs accumulate.

27.     This period of operating at a loss has also exacerbated driver shortages, further destabilizing the industry.  Despite the high demand for drivers, stagnant pay rates due to carriers' financial struggles have led to high turnover and operational inefficiencies.  Fleets are paying more to recruit and train new drivers, only to lose them due to poor pay and working conditions, compounding the industry's difficulties.  Fortunately, the Debtors to date have been able to insulate themselves from much of this driver attrition, but are aware that they must be proactive to protect their operations and the driver satisfaction.  Moreover, the industry has seen unprecedented industry exits and bankruptcies, including the bankruptcy of North America industry titans Yellow Corp. in 2023 and Pride Group earlier this year.

28. Seeing these operational pitfalls, I have worked expeditiously with the Debtors' various constituencies to navigate this time of unprecedented disruption. Like many other carriers, I was able to secure forbearance agreements with several lenders to provide temporary relief as we wait for market conditions to recover. In the meantime, however, these forbearance agreements have not been enough as these difficulties persist, and I determined it is in the best interest of the Debtors to prepare for a more holistic restructuring of their obligations.

### B. Events Immediately Preceding the Filing of these Chapter 11 Cases.

29. As the Debtors' industry has suffered hardship in a more abstract way, the Debtors have faced particularized troubles. While the Debtors have engaged productively with their key partners in ensuring their business will be able to improve and all creditors will see greater recovery, the last week has been particularly tumultuous and required the Debtors to file on an expedited and in a less orderly manner than they would have preferred.

30. The Debtors first engaged Pack Law, their proposed bankruptcy counsel, on October 25, 2024, a mere week before Star Transportation PA Inc filed its petition for relief, and in that time the Debtors' key management, including myself personally, worked tirelessly with such proposed counsel to prepare the Chapter 11 Cases on an incredibly tight timetable. As these efforts continued, late in the afternoon on October 31, 2024, the Debtors learned that one of their lenders had issued an order for the repossession of some forty-seven (47) of the Debtors' financed trucks when one such truck was repossessed in Ocala, Florida. What is worse, the repossession company had taken not only the truck itself, but also the subject trailer (which was not collateral of the relevant lender) and the customer cargo.

31. Upon the backdrop of this aggressive and unjustifiable action and without being able to reach agreement with such secured lender regarding a pause in such activity, in consultation with the Debtors' proposed counsel, I determined swift and decisive action was necessary to

13

preserve the Debtors' business, protect customer cargo, and provide the best opportunity for creditors to achieve their best recovery.  Accordingly, late on November 1, 2024, Debtor Star Transportation PA Inc filed its petition for relief under chapter 11 of the Bankruptcy Code, and its proposed jointly-administered Debtors have followed suit today, together with certain key relief.

### C.  Next Steps and the Chapter 11 Cases.

32.     Notwithstanding the above difficulties, the industry has been showing signs of recovery.  Recently, major U.S. ports, particularly in southern California, are seeing surges of imports as retailers and manufacturers rush to restock with the future and cost of international trade policy uncertain.  Consumer spending has also seen steady growth, which bodes well for freight.  While cargo movement remains strong and ports are operating efficiently, load prices have yet to increase significantly.  However, as the economy enters a slow but steady recovery, I project that load prices will see a marked rise over the next sixty (60) to ninety (90) days.  Although we do not expect a dramatic shift, this gradual recovery will ensure long-term stability and improve the outlook for the Debtors' industry at large, as well as for the Debtors' creditors, with the aid of a short period of time in which to reorganize.

33.     Accordingly, I am firmly of the belief that if the Debtors can weather this moment in time, as they have to date been able to do, they shall emerge from this period of economic downturn poised for even greater success.  Indeed, the Debtors' best chance of maximizing value for their various constituencies are these chapter 11 proceedings, through which the Debtors' plan is to (a) stabilize their cashflow situation, continue their high quality transportation services, and (b) negotiate with their key stakeholders and creditor constituencies to collectively navigate these unsure times and position the Debtors' business for a successful future.

34. In preparing for these Chapter 11 Cases, I discussed various reorganization options with various key stakeholders of the Debtors and the Debtors' proposed restructuring counsel. In so doing, one of my chief priorities was ensuring the going concern value of the Debtors is maintained for the benefit of their clients, drivers, creditors, and all parties in interest. I have worked expeditiously with the Debtors' proposed counsel to build consensus with the Debtors' key operational partners, including but not limited to RTS, Pilot, and WEX, and believe that these efforts will result in a smooth transition into chapter 11, as the emergency motions submitted herewith demonstrate. Notably, the Debtors have negotiated terms with RTS to allow for the postpetition continuation of the factoring of the Debtors' receivables in the form of debtor-in-possession financing that will allow the Debtors' operations to continue. In the coming months, I anticipate the Debtors will continue to operate in the ordinary course, benefit from the temporary respite the chapter 11 cases will provide as the Debtors reorganize their operations, and maximize the chance of creditor recovery in the long term.

## **The Debtors' First Day Pleadings**

35. The First Day Pleadings seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession. I have been advised of the relief requested in the First Day Pleadings and believe that the relief sought in each First Day Pleading (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value and (b) best serves the Debtors' estates and the interests of their creditors, patients, and other parties in interest. The facts set forth in each First Day Pleading are incorporated herein by reference.

36. In light of the exigent circumstances surrounding the filing of the Chapter 11 Cases, the chapter 11 petitions of the relevant Debtors and the First Day Pleadings themselves have been

prepared and filed on a "rolling basis" to ensure that the Debtors' urgently-needed relief may be properly put before this Court. To that end, the Debtors and their professionals continue to review all of the First Day Pleadings and the relief requested therein and reserve the right to supplement such First Day Pleadings in the course of such review. For the avoidance of doubt, the First Day Pleadings generally seek incredibly urgent interim relief to ensure the Debtors' continued going concern value in the coming weeks and are narrowly tailored to request only the relief that is actually needed on an emergency basis. The Debtors' proposed counsel have advised me they will continue to work with all parties in interest, in particular before any final hearing to consider the relief requested in the First Day Pleadings, to continue the Debtors' prepetition commitment to transparency and consensus-building.

37. The First Day Pleadings, each of which the Debtors respectfully request be considered on an emergency or *ex parte* basis, as the case may be, include the following:

a. *Debtors' Emergency* Ex Parte *Motion for Joint Administration of Bankruptcy Estates, Intra-District Transfer, as Applicable, and Request for Expedited Consideration* (the "Joint Administration Motion");

b. *Debtors'* Ex Parte *Motion for Authorization to File Consolidated Chapter 11 Case Management Summary* (the "Consolidated Case Management Motion");

c. *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and Consolidated List of the Top Thirty Unsecured Creditors, and (II) Establishing Notice Procedures* (the "Consolidated Creditor List and Notices Motion");

d. *Debtors' Motion for Entry of an Order (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Providers Adequately Assured of Future Performance, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief* (the "Utilities Motion");

e. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to (A) Continue Honoring Their Obligations Under Insurance Policies Entered Into Prepetition and Satisfy Prepetition Obligations Thereto and (B) Renew, Supplement, Modify, or Purchase Coverage, and (II) Granting Related Relief* (the "Insurance Motion");

16

    f. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms, and (II) Granting Related Relief* (the "<u>Cash Management Motion</u>");

    g. *Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Pay Prepetition Worker Wages, Salaries, and Other Compensation, and (B) Granting Related Relief* (the "<u>Worker Wages and Compensation Motion</u>");

    h. *Debtors' Motion For an Order (I) Authorizing Payment of Prepetition Claims of Critical Vendors, and (II) Granting Related Relief* (the "<u>Critical Vendors Motion</u>"); and

    i. *Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Enter Into Postpetition Factoring Agreements Supplanting Their Existing Prepetition Factoring Agreements and to Incur Credit Related Thereto, (II) Granting Adequate Protection Pursuant to Sections 361, 363 and 364 of the Bankruptcy Code, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c)(2), and (V) Granting Related Relief* (the "<u>DIP and Cash Collateral Motion</u>").

38. Furthermore, the Debtors have submitted or will imminently submit the following pleadings that the Debtors believe are of vital importance, but do not necessarily require emergency consideration:

    a. *Debtors' Application for Employment of Pack Law as Counsel, Effective as of October 11, 2024* (the "<u>Pack Law Retention Application</u>").

39. Some of the above-referenced pleadings request authority to pay certain prepetition claims against the Debtors. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one (21) days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. The Debtors will defer seeking other relief to subsequent hearings before the Court.

40. The above describes the Debtors' business and capital structure, the factors that precipitated the commencement of the Chapter 11 Cases, and the critical need for the Debtors to obtain the relief sought in the First Day Pleadings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: November 2, 2024

By: */s/ Victor Khramov*
Name: Victor Khramov
Title: President
301 NW 171st Street, Unit B
Miami Gardens, Florida 33169